PARKER *v.* WILSON.

Opinion delivered April 3, 1911.

1. GUARDIAN AND WARD—RIGHT OF WARD TO SUE BY NEXT FRIEND.—A minor, by next friend, may sue his guardian to surcharge and falsify his accounts as guardian. (Page 561.)

2. PLEADING—DEMURRER—WAIVER.—Where a cause has proceeded to final adjudication without judgment of the court upon demurrer filed in same, the demurrer will be considered to have been waived. (Page 561.)

3. WILL—CONSTRUCTION.—In construing the provisions of a will the intention of the maker is first to be ascertained, and, when not at variance with recognized rules of law, it must govern. (Page 561.)

4. SAME—CONSTRUCTION.—The intention of the testator is to be gathered from all parts of the will, and such construction given as best comports with the purposes and objects of the testator. (Page 561.)

5. SAME—WHEN TRUST CREATED.—Where a testatrix appointed her husband as guardian of her infant son, to whom she left all of her property, and directed the husband to take and hold all such property in trust to manage and direct and to bargain, sell and convey until the son should be of age, the husband became a trustee for the benefit of the son during his minority. (Page 562.)

6. SAME—TRUST—RIGHT OF TRUSTEE TO POSSESSION.—Where a testatrix left her entire estate to her infant son, and appointed her husband as guardian and trustee to take and hold the son's property so devised, her administrator, there being no debts, was justified in paying over her estate to her husband as such trustee. (Page 562.)

7. GUARDIAN AND WARD—LOAN OF WARD'S MONEY—LIABILITY.—Under Kirby's Digest, § 3809, providing that "no guardian shall be personally responsible for any money belonging to his ward and loaned out by him under the direction of the court, and on security which may have been approved by the court, in case of the inability of the person to whom such money may have been loaned, or his security, to pay the same," *held,* that where a guardian loans the ward's money without first obtaining an order of court authorizing him to make the loan, he assumes the responsibility, and no subsequent order of the

probate court confirming his action will relieve him from liability if loss occurs.  (Page 564.)

8.  SAME—LOAN—DIRECTION OF COURT.—Where a guardian testified that, some time before making a loan of his ward's money, he presented a petition to the probate judge for authority to make the loan, and that the judge indorsed on the petition: "Examined and allowed," and the guardian put it among the files of the guardianship papers, but did not give it to the clerk to be recorded, a finding of the chancellor that the guardian did not obtain an order of the probate court authorizing him to make the loan will not be disturbed. (Page 566.)

9.  SAME—UNAUTHORIZED LOAN—INTEREST.—Though a guardian, without an order of the probate court, loaned the money of his ward at ten per cent. interest, but upon insufficient security, he will be charged with interest at the legal rate only, in the absence of proof that he could have obtained a higher rate upon sufficient security.  (Page 569.)

Appeal from Monroe Chancery Court; *John M. Elliott,* Chancellor; reversed.

### STATEMENT BY THE COURT.

This action was instituted by Marie A. Justice as guardian and next friend of Earle M. Wilson, a minor, in the chancery court against H. A. Parker as guardian of said Earle M. Wilson and W. K. Sims, T. H. Jackson and H. A. Carter as sureties on his guardian's bond to surcharge and falsify his account as such guardian.

The defendants demurred to the complaint, and subsequently filed an answer, denying the allegations of the complaint.

The facts are as follows:  Mary A. Wilson died at Brinkley in Monroe County, Arkansas, on December 17, 1891, leaving surviving her two children, Earle M. Wilson, born October 17, 1888, and Ollie H. Wilson, born in October, 1891; and her husband, Sidney J. Wilson.  Ollie died in November, 1892, without issue, and left surviving him, his brother Earle as his sole heir at law. Earle and his father, Sidney J. Wilson, are both living.  Mary A. Wilson left a will, which is as follows:

"In the year of our Lord, 1890, on the 6th day of May, in the full possession of all my faculties, I make this my last will and testament, revoking all former wills I may have made before this date.  And in the name of God I do write these lines declaring them to be my will incontestable under the law now and forevermore.  Unto my beloved husband, Sidney J. Wilson, I do give and bequeath the sum of ten ($10.00) dollars.  This to be

paid out of the first money accruing from my estate. With the exception of the ten ($10.00) dollars given to my husband, Sidney J. Wilson, I do give and bequeath unto my beloved and only son, Earle Malcolm Wilson, all my earthly possessions. All lands, houses, house furniture, notes, bonds, mortgages and ready money that I may possess at my death or that may come to me after my death by division of estate or otherwise, I do give and bequeath unto him. I furthermore appoint my husband, Sidney J. Wilson, sole guardian of my son and his property. He is to take entire charge of both, managing the one and educating the other as he sees fit. As a mark of my esteem and affection, I require no bond and hold him free of the law. Therefore, he is to take and hold all my son's, Earle Malcolm Wilson's, property in trust to manage and direct, to bargain, sell and convey in my son's name until the latter is twenty-one (21) years of age. Then my husband, Sidney J. Wilson, is to render unto my son all I die possessed of, with legal rate of interest thereon, less expense of raising and educating. But in that settlement I hold my husband accountable to no one save my son and his Maker. In the event of my having further issue, children born to me in this marriage, my husband shall be sole guardian of them all, and that my children, let them be one or many, shall share and share alike in all I die possessed of with my son, Earle Malcolm Wilson. Should I not have further issue in this marriage and should my son, Earle Malcolm Wilson, die before he is twenty-one (21) years of age, then one-half of all I die possessed of I do give and bequeath unto my youngest brother, G. M. Deadrick, and the other half to Mrs. A. W. Parks, my husband's sister. Should my brother inherit one-half of my property before he becomes of age, I appoint my husband his guardian till he is twenty-one (21) years of age and without bond. Of my own will and accord I have written these lines, and that it is my will that such disposition be made of my property witness my hand and seal below. Should any one, friend, foe or kindred, on any grounds or technicalities whatsoever endeavor to set aside or break this my last will and testament, let them stand defeated before the law and accused before all mankind.

"Mary A. Wilson, May 6, 1890.

"Attest: Mrs. E. P. Forte, E. P. Forte."

The will was admitted to probate at the October term, 1893, of the probate court of Monroe County. On the 23d day of February, 1892, letters of guardianship upon the estate of Earle M. Wilson, a minor, were granted to H. A. Parker. He executed a bond as such guardian in the sum of $2,000, with W. K. Sims, T. H. Jackson, S. J. Price and H. A. Carter as his sureties.

In February, 1892, H. A. Parker was also appointed guardian of Ollie Houck Wilson and executed a bond as such guardian. These letters of guardianship were granted in Monroe County in September, 1893. H. A. Parker was granted letters of administration upon the estate of Ollie Houck Wilson, who died as above stated in November, 1892. He gave bond as such administrator in the sum of six hundred dollars. At the October term, 1892, of the Monroe Probate Court, H. A. Parker was granted letters of administration upon the estate of Mary A. Wilson, deceased, and executed a bond in the sum of $3,000. The defendants in this action were not sureties on any of said bonds except the bond of H. A. Parker as guardian of Earle M. Wilson. On the 15th day of October, 1906, Marie A. Justice was appointed guardian of Earle M. Wilson by the probate court of Greene County, Arkansas. The said Earle M. Wilson was at that time 18 years old, and resided in Greene County.

The complaint in this action was filed on July 22, 1908. Earle M. Wilson became of lawful age while the suit was pending, and was substituted as plaintiff in the action.

The decree in the case was rendered on October 5, 1910.

When Mary A. Wilson died, there was a balance due her on the purchase price of a house and lot in Brinkley, Ark., which she had conveyed to Lora N. Campbell. This balance amounted to $1,280.20, and was paid to H. A. Parker as her administrator in May, 1893. She had no other estate except her personal effects, and a few household goods, of little or no value. Her life was insured for $2,000, and her children were named as beneficiaries in the policy. On March 9, 1892, H. A. Parker, as guardian of said minors, collected the full amount of said insurance policy.

On May 13, 1892, H. A. Parker loaned to J. B. Hughes the sum of $850 out of the amount received on said insurance policy. He took Hughes's notes therefor, payable on or before January 1,

1893, to himself as guardian of Earle and Ollie Wilson with interest at the rate of 10 per cent. per annum from date until paid. Hughes was a farmer in Monroe County, and gave certain rent notes and other notes as collateral. Subsequently Hughes became insolvent, and it is conceded that Parker never collected any part of said note except $280, nor realized anything on the collaterals. At the July term, 1893, of the Monroe Probate Court, Parker filed a settlement of his guardianship of Earle and Ollie Wilson. He charged himself with the amount of the insurance received, viz., $2,000, and credited himself with amounts which left the estate of the minors indebted to him in the sum of 67 cents. Among his credits appears the following:

"Your guardian loaned to J. B. Hughes $850, which was more than he should have loaned under the circumstances, which was loaned on the 13th day of May, 1892............$850.00
Interest to May 13, 1893...........................  85.00

"Total principal...............................$935.00
May 13, 1893, by amount paid by Hughes.............  280.00

"Balance due from Hughes....................$655.00"

His account was approved and confirmed at the October term, 1893, of said court.

H. A. Parker was the principal witness in the case. His testimony is very voluminous, and we shall only set out such portions as we deem necessary for a proper understanding and determination of the issues involved in this suit.

Parker lives at Clarendon, Ark., and has been a practicing lawyer there for 30 years. In regard to the Hughes loan, he testified that he went to Judge Mayo, the then county and probate judge, and advised with him before he made the loan; that Judge Mayo had lived in the neighborhood where Hughes resided, and knew all about him and his circumstances; that Judge Mayo approved the loan made to J. B. Hughes, and ordered him as guardian of said minors to make it. We quote from Parker's testimony the following:

"Q. And Judge Mayo was at that time judge of the probate court of Monroe County? A. Yes, sir. I then drew up the petition, as stated, and it was examined and allowed, and it, with

all the Wilson papers, was burned at the fire. I never knew whether it was on or off the record until this suit had been filed. I heard the testimony of Mr. Hinton saying it had never been put on record, which was nothing uncommon for the clerk at that time. At that time Mr. Albert Hinton was deputy, acting for Mr. Mills, who was in the campaign. He began the campaign for Auditor in January or February, 1892, and remained in the campaign until the last of June, 1892."

Parker concedes that he did not account for the balance of purchase money of the Brinkley lots in his guardian's settlement. He testifies that he paid that amount to Sidney J. Wilson, the father of Earle M. Wilson at various times, and in detail gives the time of such payments and the circumstances connected therewith.

Additional facts will be stated or referred to in the opinion.

The demurrer to the complaint was never acted on by the court, and the chancellor, after hearing the evidence, charged Parker with the sum of $1,280.20, with 10 per cent. interest thereon from May 1, 1893, which amount is the balance due on the purchase money of the sale of the house and lot at Brinkley. The chancellor further charged him with the sum of $655 with 10 per cent. interest thereon from May 13, 1893, "which was the amount of the loan made to J. B. Hughes by the guardian H. A. Parker without any order from the Monroe Probate Court to make such loan."

A decree was accordingly entered against all of the defendants for amounts, both principal and interest.

The defendants have appealed.

*J. W. House* and *Ratcliffe, Fletcher & Ratcliffe,* for appellants.

1. The probate court had no jurisdiction to appoint Mrs. Justice guardian. 72 Ark. 299; 80 *Id.* 351; 32 *Id.* 92; Kirby's Digest, § 3757; *Ib.* 3771-2, 3773-4-5.

2. The loan to Hughes was sanctioned by the probate court. 33 Ark. 294. In the absence of fraud, chancery will not interpose for mere errors, *however gross.* 33 Ark. 575, 581; 34 *Id.* 63, 72; 36 *Id.* 383, 390; 43 *Id.* 171; 47 *Id.* 413; 77 Ark. 351.

3. The will vested the title to all her property in her husband in trust for the minor. No authority was needed from the

probate court. The order probating the will was all that was necessary. 33 Ark. 759. The father is the natural guardian. Kirby's Dig. § 3757. Parker has settled with the trustee for more than he collected from the Campbell notes. Kirby's Dig. § § 110-129.

4. No one except Sidney J. Wilson could sue Parker for an accounting.

5. It was error to charge Parker with 10 per cent. interest. Kirby's Digest, § 3806; 63 Ark. 450.

6. There could be no liability against the sureties beyond $2,000, the amount of the bond, nor for more than 6 per cent. interest. 35 Ark. 93; 33 Id. 658; 63 Id. 218.

C. F. Greenlee, for the sureties.

1. There was no default until Parker was ordered to pay over the amount found due. 35 Ark. 93; 33 Id. 658; 63 Id. 218.

2. The probate court authorized the loan to Hughes. But these sureties are not liable for any misapplication of Ollie Houck Wilson's funds.

3. They are not liable for any moneys that came to Parker's hands as administrator.

4. Nor could they be liable for more than two thousand dollars, the limit of the bond. 65 Ark. 415-417; 18 N. Y. 35; 73 Me. 384; 64 Ark. 477.

5. The evidence does not sustain the judgment.

Thomas & Lee and Johnson & Burr, for appellee.

1. Mrs. Justice sued as next friend of the minor. 71 Ark. 258. So, whether she was guardian or not, she represented the minor. Besides, Earl Wilson became of age, and the court ordered the suit to proceed in his name. 4 S. W. 311; 102 S. W. 820. But Mrs. Justice was properly appointed. Kirby's Digest, § § 3759, 3758.

2. The loan to Hughes was never sanctioned by the probate court. Kirby's Dig., § § 3512 to 3517, 3804 to 3809; 62 Ark. 597; 60 Id. 355; 45 Id. 527; 12 A. & E. Enc. Law, (2 ed.) 570. Parker is liable. 164 Fed. 685; 90 S. W. 69; Kirby's Dig., § § 3804-3809; 15 Am. & Eng. Enc. Law (2 ed.) 107.

3. Except as guardian, S. J. Wilson could exercise no con-

trol over Earl's person or property. No bond was given by Wilson. Mansf. Dig., § 3471; Kirby's Dig., § § 3763, 3757.

It is a rule never to appoint a trustee of an infant's estate without requiring security. 28 Am. & Eng. Enc. Law (2 ed.) 975.

4. Parker was not entitled to credit for the amount of the vouchers for amounts paid S. J. Wilson. These expenditures were never allowed by the probate court, nor could they exceed the income of the infant's estate. Kirby's Dig., § 3792; 63 Ark. 450. The statute is mandatory. 83 Ark. 223; 53 *Id.* 545, 559. The $655 balance of the Hughes loan was never "accounted for." 172 Ill. 284; 50 N. E. 144; 77 Mo. 310; 100 Mass. 232; 42 N. H. 74.

6. Parker was liable for 10 per cent. interest. Mansf. Dig. § 3514.

7. The sureties are liable for an amount equal to the face of the bond and *interest* thereon. 65 Ark. 415. An order to pay over is not necessary in cases of final settlement. 74 Ark. 520; 48 *Id.* 251; 45 *Id.* 505; 33 Ark. 727, 729, 730. The sureties were properly sued in the same suit with Parker. 33 Ark. 727 to 730. A failure to account for moneys received is a legal fraud, and the court had jurisdiction. 77 Ark. 351, 354.

8. Parker is liable for the $1,650 collected from Mrs. Campbell. 5 Gill 60; 27 Am. Dec. 460; 86 Md. 176; 51 Md. 352; 86 *Id.* 176; 6 Dana 3; 12 Mo. 365; 78 Ill. 192; 1 Rich. L. (S. C.) 351; 2 Hawks (N. C.) 497.

*Ratcliffe, Fletcher & Ratcliffe* and *J. W. House,* for appellant in reply.

1. Where two or more provisions in a will are repugnant, the last should prevail. 107 Ill. 443; 12 Wend. (N. Y.) 602; 6 Ind. 293; 22 Me. 430; 89 Ill. 246. The general intent of the testator will prevail over expressions indicating a different particular intent. 8 W. Va. 1; 9 Paige 107; 78 Pa. St. 40; 50 Miss. 15; 7 Md. 8; 109 Ind. 506; 68 Ill. 594. The intention must be gathered from the whole will. 68 Ill. 594; 58 N. Y. 592; 8 Bush 434; 55 Ill. 160. Mrs. Wilson clearly intended to vest her entire estate in her husband as trustee.

2. A settlement with the trustee released Parker. Wilson only could bring this suit against Parker. Kirby's Dig., § 6002.

·An action on a guardian's bond does not accrue until final settlement and order to pay over. 39 Ark. 145; 21 *Id.* 447; 35 *Id.* 93; 48 *Id.* 261; 25 *Id.* 108. Nor are the sureties liable beyond the penalty of the bond. 65 Ark. 415. Chancery has no jurisdiction to vacate allowances in the probate court which are merely erroneous. 39 Ark. 256-7; 36 *Id.* 389; 42 *Id.* 189.

3. The testator had the right to dictate that her husband should not give bond. 120 Ind. 94; 12 N. J. Eq. (1 Beas.) 289; 129 Mass. 339; 125 Ala. 135; 28 Am. & Eng. Enc. Law (2 ed.) 975.

HART, J., (after stating the facts). 1. It is first insisted that the appointment of Marie A. Justice as guardian of Earle M. Wilson by the Greene Probate Court in 1906 was void because the guardianship of H. A. Parker was pending. It is not necessary to consider this point, for Mrs. Justice also brings the suit as next friend of the minor. *St. Louis, I. M. & S. Ry. Co.* v. *Haist,* 71 Ark. 258.

2. It will be noted that the demurrer to the complaint was not acted upon by the court. In the case of *Kiernan* v. *Blackwell,* 27 Ark. 235, it was held (quoting from syllabus): "Where a cause has proceeded to final adjudication, without judgment of the court upon demurrer filed in same, the demurrer will be considered to have been waived." Recent decisions of this court have recognized and applied the rule. Therefore the case is presented to us just as if the defendant had assented to the jurisdiction of the chancery court to try the case, and had made no objections to the suit proceeding to determination against them.

3. It is next contended by counsel for defendants that the property of Mary A. Wilson, deceased, never came into the possession of H. A. Parker as guardian of her minor children, and that he was not accountable to the probate court as such guardian. This brings us to a construction of her will. It is set out in the statement of facts and need not be restated here. The power of one, legally competent to make a will, to dispose of his property as he sees fit, subject to the restrictions provided by the statutes, is a legal incident to ownership. In construing the provisions of a will, the intention of the maker is first to be ascertained, and, when not at variance with recognized rules of law, must govern. The intention of the testator must be gathered from all parts of

the will, and such construction be given as best comports with the purposes and objects of the testator, and as will least conflict.

These canons of construction are so firmly established as to need no citation of authority to support them.

It will be noted that Mary A. Wilson bequeathed to Earle M. Wilson, her son, all her earthly possessions. Continuing, the will provides: "I furthermore appoint my husband, Sidney J. Wilson, sole guardian of my son and his property. He is to take entire charge of both, managing the one and educating the other as he sees fit. As a mark of my esteem and affection, I require no bond and hold him free of the law. Therefore, he is to take and hold all my son's, Earle Malcolm Wilson's, property in trust to manage and direct, to bargain, sell and convey, in my son's name until the latter is twenty-one (21) years of age."

A subsequent clause of the will provides that future issue of her marriage shall take equally and in like manner with Earle M. Wilson. Ollie Houck was subsequently born unto her. The testatrix had the right and the power to leave her property in trust for her children during their minority and to name such trustees as she saw fit.

In her will she expressed the object and purpose of the trust and defined explicitly the powers of the trustee. In the application of the rules of construction above announced, we are of the opinion that, under the terms of the will, the testatrix intended something more than to make her husband guardian of her minor children; or to give him power to manage her property, but that she intended to place her property in trust for her children during their minority. She does not stop with directing him to manage the property, but goes further and uses the word "hold," which has a technical meaning as expressing tenure. He is given power to bargain, sell and convey. Hence, instead of merely intending to appoint her husband guardian of her children and to give him power to manage the property for them, we are of the opinion that, by direct and express terms, she made him trustee of her property during their minority with power to sell same, and that the legal title thereto during the trust term was in him as trustee. *Fay* v. *Taft*, 12 Cush. (Mass.) 448.

It follows, then, that Sidney J. Wilson, under the will, became entitled to take and hold possession of the property of Mary A.

Wilson at her death unless he was for some reason incapacitated from executing the trust. It also appears from the testimony of Parker himself that Sidney J. Wilson was somewhat improvident, and also that he was arrested and tried for the murder of his wife. He was, however, acquitted of the charge in 1892, and the presumption is that he was innocent. Parker says that he did not know of the existence of the will at the time letters of administration on the estate of said Mary A. Wilson were granted him. If he had known of its existence, of course there would have been no necessity for the administration; for it does not appear that any debts were probated against her estate. It is true Parker turned over the money belonging to her estate to Sidney J. Wilson at various times; but he is no more liable on that account than if. he had turned it all over at one time. He was entitled to the property under the terms of the will, and, there being no necessity for an administration of Mary A. Wilson's estate, there was likewise no need for Parker to procure an order of the probate court directing him to turn the property over to the trustee. The trustee being entitled to it under the will, no one else could complain except creditors of Mrs. Wilson's estate, and there are none. Without going into detail, it is sufficient to state that Parker has fully accounted for the whole of Mary A. Wilson's estate. He has given in detail the amounts paid over to the trustee and the purposes for which they were paid. It seems from his testimony, which is not contradicted, that all these amounts, except $100, were paid to the trustee to be used for the benefit of the minor child, Earle M. Wilson. Therefore, we hold that Parker is not liable for the $1,280.20, the amount received by him as belonging to the estate of Mary A. Wilson, deceased. In reaching this conclusion, we have not allowed him the $100 paid by him to one of the attorneys of Sidney J. Wilson. We think that the other amounts paid the trustee exceed the amount received.

4. Of course, the amount of the insurance did not become part of the estate of Mary A. Wilson at her death; for her children were named as beneficiaries in the policy. The amount of this policy, viz., $2,000, vested in the children upon the death of their mother.

It will be noted that Earle M. Wilson became of legal age during the pendency of the suit, and before the decree was ren-

dered. Upon arriving of age, he was substituted as plaintiff. Parker had made a settlement of his accounts as such guardian in the probate court at its July term, 1893, and his settlement was confirmed at the next term of the court. One of the objects of this suit is to surcharge and falsify that account. We have not set out the account in full for the reason that the chancellor found in favor of Parker as to all the items except the Hughes notes, and no appeal has been taken by Earle M. Wilson from his decision. Hence it will only be necessary for us to consider the item of the Hughes note.

The chancellor charged Parker with the loss resulting from the non-collection of the loan made to Hughes. Counsel for Parker strongly insist that the chancellor erred in so holding. Our statutes contain provisions authorizing the money of the ward to be loaned and directing the guardian to report the disposition of the money. Section 3604 of Kirby's Digest provides that if at any time the guardian shall have on hand money of the ward beyond what is necessary for his education and maintenance he shall loan same under the direction of the court. Sec. 3806 contains a provision in regard to the rate of interest and the kind of security required. Sec. 3807 makes it the duty of the guardian at every annual settlement to make report of the disposition made of the money of the ward, and, in case it is loaned out, to report the name of the person to whom loaned, the description of the real estate security and where situate, and its value. Sec. 3809 provides that "no guardian shall be personally responsible for any money belonging to his ward and loaned out by him under the direction of the court, and on security which may have been approved by the court, in case of the inability of the person to whom such money may have been loaned or his security to pay the same."

The first question that presents itself is whether or not these statutory provisions are mandatory. The precise question has never been passed upon by this court.

In this connection it may be stated that we have a statute which provides that, unless the direction of the probate court is obtained therefor, "the guardian shall not be allowed in any case for the maintenance and education of the ward more than the clear income of the estate." Kirby's Digest, § 3792. This section has been construed to be mandatory, and the court held that

it takes from the probate court the discretion to approve expenditures of a guardian for the support and education of the minor, which are in excess of his income, unless the expenditures have been made under an order of the court previously obtained. And that a bill in chancery will lie to surcharge and falsify the guardian's account, where he has been allowed credit in his annual settlements for amounts so expended in excess of the income from the ward's estate. *Campbell* v. *Clark,* 63 Ark. 450.

While the language of the provisions under consideration is not as strong and positive as that in the section last referred to, we think that it should be construed to be mandatory. The money belongs to the ward, but he is not consulted, and has no voice in regard to the loaning out of his own money. The statute contemplates that it shall be done under the direction and orders of the probate court. It is true the guardian may assume the responsibility and loan it out without an order of the court, but in such case he acts at his own peril. If he imprudently loans the ward's money upon inadequate security, without having first procured an order of the court to loan it, he must suffer the loss occasioned thereby, even though he may have acted honestly in the matter.

In discussing a similar statute the Supreme Court of New Jersey said:

"In cases coming under this act trustees may take the responsibility of loss upon themselves, or they may throw it on the court. If the latter course is pursued, the directions of the statute are plain. They must obtain leave and direction for the purpose of putting out the money, not put out the money first, and at some future day, when difficulties are foreseen or loss apprehended, go to the court and obtain a decree of confirmation. No such power is given to that court; nor have the administrators or trustees any authority under the statute to make such application. This may appear to be a rigid and harsh construction of the act, and I confess it appears so at first sight; but I think a moment's reflection will satisfy us of the propriety, if not necessity, of construing the power of the orphan's court in this respect strictly. It was doubtless the intention of the Legislature that the trustee, in putting out minors' money, should be implicitly governed by the direction of the court. In all such cases the court derives its information

mostly from the representations of the trustees themselves, who can or ought to have no possible temptation to impose upon the court. One common motive should govern all—that the minor's money should be safely invested. But so construe this statute as that trustees may invest money at their own risk, and at any time afterwards come before the court to seek a confirmation which shall shelter them from all danger, and be conclusive upon the rights of those who are not able to be heard, and who are reposing in the security afforded by the wholesome provisions of the law, and we place them before the court in a very suspicious attitude. Their object for coming there will be their own safety alone, and not that of the fund. You place them under strong temptations, such as many men are not able to resist; and any one who is conversant with the ordinary mode of doing business in that court must be satisfied that the greatest imposition would often be practiced, and the grosses frauds committed. I feel satisfied, therefore, to say that this order is not made in pursuance of any authority vested in the court, and, not within its jurisdiction, and therefore is no protection to the administrators." *Gray* v. *Fox,* 1 (Saxton, Ch. Rep.) N. J. Eq. 259. See, also, *Guardianship of Caldwell,* 55 Cal. 137.

In the application of these principles, we hold that where a guardian loans the ward's money without first obtaining an order of court authorizing him to make the loan, he assumes the responsibility, and no subsequent order of the probate court confirming his action will relieve him from liability if loss follows.

As we have already seen, our statutes protect the guardian from personal responsibility where he loans the ward's money under an order of the probate court. This brings us to the question: did Parker obtain an order of the probate court authorizing him to make the loan to Hughes?

Parker himself states that the order was made by the judge, and it does not appear on the records of the court. Then, too, in his accounts, Parker recognizes that he made a mistake in making the loan, and does not refer directly or indirectly to the fact that it was made under the order of the probate court. On the contrary, his statement about the matter as contained in his account filed in a year after the loan was made places the whole responsibility upon himself. No reference is made to previous

order of the court ordering or directing him to make the loan. Parker states that he went to Judge Mayo, and consulted with him about making the loan; that Judge Mayo directed him to draw up a petition, and that he would approve it. Parker further said: "I did draw up a petition and presented it to Judge Mayo. In my presence, he turned it over and indorsed it on the back, 'Examined and allowed,' and I put it in the files of the Wilson papers, and it was in those files until the fire occurred, when they were burned."

It will be noted that Parker does not state that the petition was given to the clerk so that the order might be placed upon the records of the court; but states that the petition was placed among the Wilson papers and remained there until they were burned. This negatives the idea that it was an order of the court, and that it was made in term time. It is conceded that the records of the probate court were not burned, and that the order does not appear thereon. It seems that Parker went no further than to seek the approval of the county and probate judge. From this testimony the chancellor found that Parker did not obtain an order of the probate court authorizing him to make the loan to Hughes, and a majority of the judges are of the opinion that the finding of the chancellor is not against the weight of the evidence, and consequently should not be disturbed.

I agree with my brother judges that conversations between the guardian and the probate judge, and the verbal or written advice of such judge that the loan should be made, can not operate as an order of the court as contemplated under the statute; but I am also of the opinion that Parker was speaking colloquially in his testimony, and that when he referred to the probate judge indorsing his petition on the back "Examined and allowed." he meant the probate court. He was a lawyer of experience and familiar with the statutes governing such matters. He would hardly have gone to the trouble of preparing a written petition to present to the judge in vacation. I am strengthened in this belief by the fact that in his annual settlement he complied with the statute in such matters by reporting to the court the details connected with the loan. I think it fairly deducible from his whole testimony that he obtained an order from the probate court to make the loan, and that by inadvertence such order was not

spread upon the records of the court. If my view is correct, it follows that the order of court protects him from the loss that followed; for the testimony shows that he was not negligent in collecting the loan; but that the loss was occasioned by financial misfortunes and reverses which overtook Hughes after the loan was made. See *Jacks* v. *Kelley Trust Co.*, 90 Ark. 548.

5. But the court is of the opinion that it by no means follows that because Parker is liable for the whole amount of the Hughes loan the sureties on his bond as guardian of Earle M. Wilson are also liable for the full amount of the loan. Counsel for plaintiff invoke the rule that if a person occupying the dual relation of guardian and administrator holds funds in the latter capacity, which are due and payable to his ward, the sureties on his guardian's bond are chargeable with his failure to account therefor as guardian. The theory on which the rule proceeds is that, after the time for the administration to close under the statutes has passed, the presumption is that the person transferred the funds from himself as administrator to himself as guardian, and that by operation of law he becomes liable as guardian for such funds, and in like manner the sureties on his guardian's bond also become liable. We do not decide whether the rule obtains in this State; for we hold that under the facts of this case there is no place for the application of such rule.

It is true that Parker was guardian of both Earle M. and Ollie Houck Wilson, and that he administered on the estate of Ollie Houck Wilson when he died, and that Earle M. Wilson was the sole heir-at-law of Ollie Houck Wilson. Parker, however, gave separate bonds in each case, and his co-defendants only signed his bond as guardian of Earle M. Wilson.

It will be remembered that the loan to Hughes was made on May 13, 1892; that Ollie Houck Wilson did not die until November, 1892, and Parker did not become administrator of his estate until September, 1893. It is apparent then that he never had any part of the Hughes loan in his hands as administrator of the estate of Ollie Houck Wilson, for Hughes had obtained the loan several months prior to the death of Ollie Houck Wilson. Hence we hold that sureties on the bond of Parker as guardian of Earle M. Wilson are only liable for half of the amount loaned to Hughes, that being the amount that belonged to Earle M. Wilson

when the loan was made, and was all that should have been in his hands at that time.

6. We next come to the question of interest. Parker having lent the money without an order of court and upon insufficient security, we have held him personally liable. He then stands before the court as if he had kept the money himself and neglected to obtain an order of the court to lend it.

In the case of *Merritt* v. *Wallace*, 76 Ark. 217, the court held (quoting syllabus): "Where a guardian, after being ordered by the probate court to lend out his ward's money, waited for ten years without lending the money, and without making any report to the court of his failure to do so, it was not error, after allowing him reasonable time to do so, to charge him with interest thereafter at the legal rate." The court said:

"The general rule is that the guardian must exercise reasonable skill and diligence to loan the money; and if he fails to do so, he is liable therefor at legal rate of interest; and if the ward can show it could have been loaned at a higher rate, he is chargeable with what he could have obtained."

It is true, the loan to Hughes was at ten per cent., but it is shown to have been a very injudicious loan. Hence we do not think it sufficient evidence to show that Parker could have obtained a rate higher than the legal one if he had made a loan on good security. No other testimony on the point appears in the record. Hence we hold that the court erred in charging Parker with interest at a greater rate than 6 per cent., the legal rate.

The decree will, therefore, be reversed and the cause remanded with directions to the chancellor to render a judgment against the defendant, H. A. Parker, for $655 with 6 per cent. interest from May 13, 1893, and against the other defendants for half that sum with interest at the same rate and from the same date.